Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, MONICA DAWKINS

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONICA DAWKINS, on behalf of herself and all similarly situated persons,<br><br>                    Plaintiff,<br><br>v.<br><br>DOW JONES & COMPANY, INC., a Delaware corporation,<br><br>                    Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br><br>  **1) CAL. PENAL CODE § 638.51** |

1

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff MONICA DAWKINS ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant DOW JONES & COMPANY, INC., a Delaware corporation ("Defendant" or "DOW JONES"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.wsj.com (the "Website"), a website that Defendant owns and operates.

2.    Defendant surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent. The software is intentionally deployed to accomplish Defendant's commercial objectives, including identity resolution, targeted advertising, and the monetization of consumer data.

3.    To achieve these goals, Defendant enables third-party technologies, that function as unlawful pen registers and/or trap and trace devices, to capture detailed information about users' electronic communications such as Internet Protocol ("IP") addresses, session data, and clickstream activity in real time. These tools operate covertly and without judicial authorization, violating the California Invasion of Privacy Act ("CIPA") where, as here, Plaintiff and Class Members did not consent to the interception, nor did Defendant secure a court order permitting such surveillance.

4.    A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

5.     When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

6.     When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google Trackers (Analytics / Tag Manager / DoubleClick)
- AppNexus Tracker
- Twitter (X) Tracker
- PubMatic Tracker

7.     The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website, as described herein, for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

8.     The Trackers are operated by distinct third parties, including Google LLC (Google Trackers, encompassing Google Analytics, Google Tag Manager, and DoubleClick), X Corp. (Twitter Tracker), Xandr, Inc., formerly AppNexus Inc. (AppNexus Tracker), and PubMatic, Inc., a registered California data broker (PubMatic Tracker). Defendant aids, employs, agrees, and conspires with these Third Parties by embedding and executing their code on the Website, which causes user browsers to transmit data directly to the Third Parties' remote servers. These transmissions enable the Third Parties to identify individual users and to support advertising, profiling, audience segmentation, and broader data monetization activities.

9.     On information and belief, Defendant's Website is further equipped with additional third-party advertising and data collection systems that function as pen registers and/or trap-and-trace devices or processes, including but not limited to those operated by Magnite, Inc. (Rubicon Project), OpenX Technologies, Inc. (OpenX), The

Trade Desk, Inc., Criteo S.A., Amazon.com, Inc. (Amazon Ads / Amazon Publisher Services), DoubleVerify Holdings, Inc., and Dianomi Ltd. Collectively, these third-party systems conduct ID synchronizations, bid requests, pixel calls, and audience-matching transactions that capture and transmit Plaintiff's and Class Members' addressing, routing, and signaling information in real time to multiple external servers. The transmissions occur automatically and without any user interaction, consent, or court authorization, constituting violations of the California Invasion of Privacy Act.  Magnite, Inc. and OpenX Technologies, Inc. are registered California data brokers.

10.    Through the Trackers, the Third Parties collect detailed user information including IP addresses, browser and device type, screen resolution, installed fonts, color depth, timezone, operating system, pages visited, session duration, scroll depth and/or mouse movement, referring URLs, unique identifiers (such as cookies and ad IDs), and geolocation based on IP (collectively, "User Information"). This information is used for behavioral profiling, geolocation tracking, ad targeting, cross-device tracking, and participation in real-time advertising auctions. Defendant then uses the data collected by the Trackers, and in conjunction with the Third Parties operating them, for targeted marketing and advertising that enable Defendant to monetize its Website. That is, Defendant and the Third Parties benefit from the Third Parties' unconsented-to collection of Plaintiff's and Class Members' personal information.

11.    Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other non-content metadata, they function as "pen registers" and/or "trap and trace devices" under Cal. Penal Code § 638.50. These tools silently collect routing and addressing information for commercial use without user interaction, as defined in *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

12.    The invasiveness of Defendant's conduct is compounded by the entities operating the Trackers, which collect Plaintiff's and Class Members' IP addresses and User Information and aggregate those data with information obtained from activity on

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

other websites and platforms. The Google Trackers (Analytics / Tag Manager / DoubleClick), Facebook Tracker, The Trade Desk Tracker, Tapad Tracker, AppNexus Tracker, Twitter Tracker, PubMatic Tracker, Magnite (Rubicon Project), OpenX, Criteo, Amazon Ads, DoubleVerify, and Dianomi systems all enrich and merge the information gathered from the Website with external datasets to build detailed user profiles. These profiles incorporate identifiers, browsing histories, and network-level metadata to trace Plaintiff's and Class Members' behavior across the Internet. The resulting composite data profiles are then distributed within advertising ecosystems to enable highly targeted and tailored advertising campaigns based on extensive cross-platform information about each user.

13.    Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way.

14.    By installing and activating the Trackers without obtaining user consent or a valid court order, Defendant violated CIPA § 638.51, which prohibits the use of pen registers and trap and trace devices under these circumstances.

15.    Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II.    PARTIES

16.    Plaintiff MONICA DAWKINS is a California citizen residing in Tulare County and has an intent to remain there. Plaintiff was in California when she visited the Website on multiple occasions during the class period prior to the filing of the complaint in this matter, including on September 10, 2025.  At the time of Plaintiff's recent visits, she was viewing the Defendant's Website for personal purposes. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.  On such occasions, Plaintiff interacted with the Website's homepage (among others) which is where Defendant intentionally embedded the Trackers on Plaintiff's device for the

purpose of sharing Plaintiff's personal signaling, routing, and addressing information as described herein.

17.     Defendant DOW JONES & COMPANY, INC. is a Delaware corporation that owns, operates, and/or controls the Website which is an online platform that offers goods and services to consumers.

18.     Dow Jones & Company, Inc. is a Delaware corporation with principal executive offices located at 1211 Avenue of the Americas, New York, New York. It operates as a wholly owned subsidiary of News Corporation, the publicly traded media conglomerate listed on NASDAQ under the symbols NWSA and NWS. Dow Jones is best known as the publisher of *The Wall Street Journal*, one of the most widely circulated newspapers in the United States, alongside other properties such as *Barron's*, *MarketWatch*, and *Financial News*. Established in the late 19th century, Dow Jones has grown into a global provider of news, financial information, and market analysis.

19.     Dow Jones employs thousands of staff worldwide, including journalists, editors, technologists, and business personnel. Its workforce spans newsrooms in New York, Washington, London, Hong Kong, and other major financial centers, as well as corporate offices, subscription management operations, and customer service hubs. The company's business model combines subscription revenue, advertising, data services, and digital publishing. Through these channels, Dow Jones reaches millions of readers and institutional clients across more than 150 countries.

20.     The Website, www.wsj.com functions as the flagship digital platform of Dow Jones. It provides subscribers and visitors with access to real-time financial news, global reporting, opinion pieces, and analytical tools. Beyond its role as an online version of *The Wall Street Journal*, the site incorporates subscriber account management, paywall and membership systems, mobile application integration, and digital archives. The Website is a central hub in Dow Jones's digital publishing ecosystem, designed to support subscription growth and maintain the Wall Street Journal's influence in both financial markets and broader public discourse.

21.     The Website is closely tied to Dow Jones's broader corporate data and advertising infrastructure. The website employs cookies, pixels, and other tracking technologies that capture user information and browsing behavior. These practices connect visitor activity on the Website to advertising networks and third-party partners, feeding into targeted marketing and audience segmentation.

## III.    JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

23.     This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Eastern District of California by regularly engaging with individuals in California through its website. Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

24.     Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) Plaintiff owns real property there with an intent to reside indefinitely; and (4) a substantial part of the events or omissions giving rise to the claims occurred within this District.

## IV.    GENERAL ALLEGATIONS

**1.     *The California Invasion of Privacy Act (CIPA)***

25.     Enacted in 1967, the California Invasion of Privacy Act is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California

Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

26. CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order. Cal. Penal Code § 638.51(a).

27. A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted," excluding the contents of the communication. Cal. Penal Code § 638.50(b).

28. Conversely, a "trap and trace device" is a device or process that captures "incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication," again excluding the contents. Cal. Penal Code § 638.50(b).

29. In practical terms, a pen register is a device or process that records outgoing dialing information, while a trap and trace device is a device or process that records incoming dialing information.

30. Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing phone numbers dialed from a specific line and trap and trace devices recording the phone numbers of incoming calls to that line.

31. Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line, essentially capturing the user's outgoing information.

32.     Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line, capturing the incoming information.

33.     Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme. *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.* 742F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley,* supra, *at* 1050 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications. This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations. *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

34.     The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long been actionable under common law. *Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017).

35.     Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Article III. *See Campbell v. Facebook, Inc*., 2020 WL 1023350; *In re Facebook Internet Tracking Litig*., 956 F.3d 589 (9th Cir. 2020).

36.     Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2.     *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

37.     When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources, including HTML, cascading style sheets (CSS), JavaScript files, and image assets, used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The server's instructions include how to properly display the Website, *e.g.,* what images to load, what text should appear, or what music should play.

38.     In addition, the server's instructions included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The instructions cause the Trackers to be installed on a user's browser. The Trackers then cause the browser to send identifying information—including the user's IP address and User Information to the Third Parties. These Third Parties, through their Trackers, also set cookies on Website users' browsers, which sends a unique identifier to these Third Parties that allows them to track users on the Website over multiple visits and across the Internet.

39.     A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

///

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 1:**



40.    The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests,  to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, the User Information, is used to profile users and facilitate targeted advertising.

41.    The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and Device Metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

42.    Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers. Nor did Defendant obtain a court order before installing or using the Trackers.

43.    An IP address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.*, (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (*e.g.*,

191.145.132.123). IPv4 is the traditional format of IP addresses and, because it has a finite amount of combinations, it is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

44.     Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices. IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

45.     Public IP addresses are globally unique identifiers assigned by Internet Service Providers ("ISPs") that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

46.     Public IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

47.     In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*,

---

[1]  *See*, *e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

172.16.0.0 through 172.31.255.255). They are isolated from the global Internet and can be reused across different networks without conflict. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

48.    The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

49.    An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2"). A lot can be gleaned from knowing the phone number that is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

50.    The same is true of IP addresses. The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. The private IP address then distinguishes between the devices accessing the same public IP address.[2]

///

///

---

[2] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address. So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the "Device Metadata").

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 2:**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

51.    Thus, the differences between public and private IP addresses are as follows:[3]

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

---

[3] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

52.    A public IP address is therefore "routing, addressing, or signaling information." A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

53.    As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

54.    A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

55.    A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

56.    Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined. Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[5]

57.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their

---

[4] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[5] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[6] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

interests."[7] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

58.    In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[10] For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[11]

59.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[12]

60.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[13]

61.    In addition to "reach[ing] their target audience with greater precision,"

---

[7] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[8] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[9] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[10] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[11] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[12] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[13] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[14] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[15]

62.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[16] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[17]

63.    The collection of IP addresses here is particularly invasive here: As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address. The user then opens the [website] while his phone is connected to his home Wi-Fi network. When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user. If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[18]

64.    In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers use IP addresses to identify users, append the IP address to a unique profile containing even more information about the user,

---

[14] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class Members across the Internet using their IP addresses, compiling vast reams of other personal information in the process.

65.    For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[19]

66.    When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[20]

67.    Often times, third-party scripts are installed on websites "for advertising purposes."[21]

68.    Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[22]

69.    Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

70.    As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser. This allows the Third Parties through their respective Trackers to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information, and pervasively track them across the Internet.

---

[19] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

[20] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[21] *Id*.

[22] *Id*.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

71.     Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

72.     Defendant and the Third Parties then use the public IP addresses, Device Metadata, User Information, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information. Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

73.     At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

**3.      *The Use of Trackers or Beacons and Digital Fingerprinting***

74.     Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

/ / /

75.    The Trackers also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

76.    This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

77.    When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

78.    The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

79.    In simpler terms, pen register and trap and trace mechanisms, in the digital context, refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded, or injected in the Website, which operate without user interaction or visibility.

80.    The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

81.    When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**4.    *Plaintiff And Class Members' Data Has Financial Value***

82.    Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[23]

---

[23] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444.

83.    Consumers' web browsing histories have an economic value of more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[24]

84.    There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[25]

85.    Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[26]

86.    In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[27]

---

[24] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[25] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[26] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data.

[27] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

87.    The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[28]

88.    Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

89.    The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

**5.    *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent***

90.    By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

/ / /

---

[28] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

91.     Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite the privacy implications to users.

92.     IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

93.     When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**6.**    **Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy**

94.    The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

95.    As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

96.    To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

97.    In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, User Information, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

**a.  Data Brokers And Real-Time Bidding: The Information Economy**

*Data Brokers*

98.    While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[29] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the

---

[29] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

99.    Any entity that qualifies as a "data broker" under California law must specifically register as such Cal. Civ. Code § 1798.99.82(a). The OpenX, PubMatic and Magnite Trackers are operated by registered California data brokers.

100.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[30] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[31]

101.    For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited." Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[32]

102.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[33] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political

---

[30] SHERMAN, *supra*, at 2.
[31] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.
[32] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.
[33] SHERMAN, *supra*, at 1.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[34]

103.    This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[35]

104.    As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many

> industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

> …

> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[36]

---

[34] *Id.*
[35] *Id.* at 9.
[36] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

105.    Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[37]

**Figure 4:**



/ / /

---

[37] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

106. As noted above, data brokers are able to compile such wide swaths of information in part by collecting users' IP addresses, Device Metadata, and User Information, which is used by data brokers to track users across the Internet.[38]

107. Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[39]

108. These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[40]

109. In short, by collecting IP addresses, Device Metadata, and User Information, data brokers and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

110. As a result of Defendant's installation of trackers operated by data brokers such as OpenX, PubMatic and Magnite, together with numerous third parties with which those brokers synchronize, the information of Plaintiff and Class Members is appended to existing profiles maintained by those brokers or used to generate new ones. This linkage is accomplished through the collection of IP addresses, device metadata, and other user information transmitted by the browsers of Defendant's Website visitors.

/ / /

---

[38] *Id.* at 11.

[39] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[40] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

111.  These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses, Device Metadata, and User Information linked to these data broker profiles. Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

*Real-Time Bidding*

112.  Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information? This is where real-time bidding comes in.

113.  "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[41]

114.  "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP work[s] with website or app publishers to help them participate in the RTB process." "DSPs [which is what the Trade Desk is[42]] primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact."[43] And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[44]

---

[41] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[42] HTTPS://WWW.THETRADEDESK.COM/OUR-DEMAND-SIDE-PLATFORM ("The leading demand-side platform for data-driven advertising").

[43] *Id.*

[44] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

115.   In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs like The Trade Desk help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

116.   The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs [here, *e.g.*, Trade Desk]. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost.  But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process.   This information can be added to existing dossiers DSPs have on a user.[45]

**Figure 5:**



---

[45] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

117.   Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids. These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

> the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities.  As a consequence, the bid request is not the end of the road.  The DSP enlists a final actor, the data management platform (DMP) [or a data broker].  DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers.  The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[46]

**Figure 6:**



118.   In other words, SSPs can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know about that user with the information other data brokers know about that user. If there is

[46] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

a match, then the SSPs will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

119.   Likewise, a DSP like The Trade Desk can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

120.   All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

121.   As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

   a.   "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

   b.   "send[ing] sensitive data across geographic borders."

   c.   sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad.  Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[47]

122.   Given The Trade Desk operates a DSP here, the last point is particularly relevant, as it means The Trade Desk collects and discloses Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an

---

[47] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

advertisement. This greatly diminishes the ability of users to control their personal information.

123. Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[48]

124. For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the shear number of entities that receive personal information[49]:

**Figure 7:**



125. All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements");

---

[48] Geoghegan, *supra*.
[49] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

*Cookie Syncing*

126.    It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers like OpenX, PubMatic and Magnite who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website. The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

127.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies and match the different IDs they assign for the same user while they browse the web."[50] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[51]

128.    Cookie syncing ("CSync") works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with*

---

[50] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[51] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1
2

*a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

3

*…*

4
5
6
7
8
9

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[52]

**Figure 8:**

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



25
26
27

129.   Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2

28

---

[52] Papadopoulos, *supra*, at 1433.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[53]

130.    On the flip side, "CSync may re-identify web users even after they delete their cookies."[54] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[55] But if a tracker can "respawn" its cookie or link to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure.  Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[56]

131.    Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[57]

132.    Cookie syncing is precisely what is happening here. When each of the Trackers are installed on Website users' browsers, they are calling and/or syncing their cookies with other third parties on the Website. The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all of the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from being anonymous when they visit the Website.

133.    To summarize the proceeding allegations, data brokers focus on collecting as much information about Website users as possible to create comprehensive user profiles, and the Trackers sync with numerous other data brokers that do the same. The Third Parties collect IP addresses, Device Metadata, User Information, and unique user IDs in the first instance, but those pieces of information are connected to information the Third Parties glean from other sources (*e.g.*, various data brokers) to build

---

[53] Papadopoulos, *supra*, at 1434.
[54] *Id.*
[55] *See id.*
[56] *Id.*
[57] *Id.* at 1441.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

comprehensive profiles. Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

134.    Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

135.    Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

136.    Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

137.    When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

138.    On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

139.    Defendant deploys the Trackers to build a behavioral profiling and targeted advertising system. Several of these trackers are dynamically injected into the Website through tag management systems, initiating the collection of user behavior such as pageviews, navigation patterns, and session metadata. Others are directly embedded into the Website's code, firing automatically upon page load. Together, these technologies associate user behavior with device identifiers, cookies, and pseudonymous advertising IDs, facilitating the construction of persistent user profiles for advertising and marketing purposes.

140.    The Trackers participate in programmatic advertising ecosystems by capturing behavioral signals from the Website and linking them to advertising audiences. These trackers enable personalized ad delivery based on users' site interactions and associate browsing activity with broader ad networks through identifier syncing. Each of these platforms sets or reads cookies to maintain persistent tracking across sessions and domains, effectively participating in workflows designed to reidentify users and expand behavioral audience segments for targeted advertising.

141.    The Trade Desk performs identity enrichment and cross-device tracking functions that expand the scope of behavioral data captured through the Website. By linking browsing activity with pseudonymous identifiers and participating in identifier syncing across advertising networks, these entities create detailed, persistent user profiles that extend beyond a single browsing session or device. The Trade Desk utilizes frameworks like Unified ID 2.0 to map users across domains. These practices convert

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

raw behavioral data collected on the Website into monetizable, targetable audience segments within the programmatic advertising ecosystem.

# V.    SPECIFIC ALLEGATIONS

## 1.    The Google Trackers

142.    The Google Trackers are a suite of behavioral and advertising scripts implemented through Google Analytics, Google Tag Manager, and Google DoubleClick technologies, typically delivered via domains such as www.googletagmanager.com, analytics.google.com, googlesyndication.com, and doubleclick.net. On the Website, the Google Trackers are automatically executed during the initial homepage session, initiating background communication with Google's servers and enabling real-time capture of user connection data without any user interaction.

143.    Once a user loads a page, the Google Trackers execute in the background, generating outbound requests that transmit session-specific metadata including IP address, browser type, referrer URL, and unique identifiers such as tid, cid, and gtm values. These communications occur through asynchronous JavaScript calls and are continuously refreshed during the browsing session, allowing Google to receive signaling data corresponding to each user visit to the Website.

144.    The data transmitted through the Google Trackers supports identity resolution by linking session identifiers with cookies and other persistent values such as _ga, _gid, and _gcl_au. These identifiers enable Google to correlate a user's session on the Website with prior or concurrent activity on other sites that deploy Google's advertising and analytics tools. In doing so, Google constructs a cohesive metadata graph that maps addressing and routing information to recognizable user profiles across its advertising ecosystem.

145.    The Google Trackers also facilitate Defendant's participation in targeted advertising and remarketing processes by transmitting metadata to DoubleClick and Google Ads endpoints. Those transmissions allow advertisers to segment audiences and

deliver targeted campaigns based on real-time behavioral signals gathered from the Website, including page views, dwell time, and referral patterns.

146.    The Google Trackers thus advance Defendant's data-monetization strategy by converting user metadata into commercially valuable insights. Google provides Defendant with aggregated analytics and audience metrics, while simultaneously integrating that same metadata into Google's ad-delivery network to refine audience targeting and optimize bidding performance. Through this dual flow of information, Defendant benefits financially from the continuous capture and exchange of addressing, routing, and signaling data generated during users' interactions with the Website

147.    Figure 9 below shows DNS query and response records between the local client 198.19.190.52 and the resolver 198.19.0.2 for multiple Google-associated domains. The visible queries include securepubads.g.doubleclick.net, pagead2.googlesyndication.com,42ffe5719ea179d049bc39a18f45be9a.safeframe.googl esyndication.com, www.googleadservices.com, www.googletagservices.com, fonts.googleapis.com, tpc.googlesyndication.com, www.googletagmanager.com, analytics.google.com, safebrowsing.googleapis.com, imasdk.googleapis.com, ad.doubleclick.net, 13961696.fls.doubleclick.net, googleads.g.doubleclick.net, stats.g.doubleclick.net, and adservice.google.com. Each entry shows the browser's lookup requests and the numerical IP addresses returned by the responding server, establishing that live communications occurred with those external Google endpoints. The displayed data provides verifiable network records evidencing the transmission path, header configuration, and endpoint identification of the observed exchange.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 9:**



148.    Figure 10 below shows a set of network requests recorded in the browser's developer console directed to the domains www.googletagmanager.com and www.google.com. The visible entries include URLs such as https://www.googletagmanager.com/static/service_worker/…[full URL omitted], https://www.google.com/ccm/collect/…[full URL omitted], and multiple script loads using the path /gtag/js?id= followed by identifiers including G-K2H7B9JRSS, DC-13961696, and AW-10713060838. Each record lists the associated request method (GET or POST), the HTTP status code 200, the content type designations ("script," "doc," or "ping"), and measured response times ranging from 28 to 236 milliseconds. The displayed data constitutes direct evidence of the network metadata defining the protocol, endpoint, and communication context for this transaction, showing the browser's live exchanges with Google-operated servers.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 10:**



149.   Figure 11 below shows network request entries captured through Fiddler, including HTTPS communications with multiple remote hosts such as tagan.adlightning.com, t.co, stats.g.doubleclick.net, static.cloudflareinsights.com, and static.captcha-delivery.com. One visible entry reflects a POST request directed to https://stats.g.doubleclick.net/g/collect/…[full URL omitted] with parameters including v=2, tid=G-K2H7B9JRSS, cid=1203567143.17587238, and aip=1, along with the host designation stats.g.doubleclick.net. The request headers show fields such as User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64), Accept-Encoding: gzip, deflate, br, zstd, and Origin: https://www.wsj.com, indicating structured metadata describing the browser environment and request routing path. The displayed data provides verifiable network records evidencing the transmission path, header configuration, and endpoint identification of the observed exchange.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 11:**



150.    Figure 12 below shows a request header record for an HTTPS connection directed to pagead2.googlesyndication.com. The header fields displayed include :method: GET, :path: /pagead/gen_204…[full URL omitted], :scheme: https, Accept: */*, Accept-Encoding: gzip, deflate, br, zstd, and Accept-Language: en-US,en;q=0.9. Additional visible parameters include Cache-Control: no-cache, Pragma: no-cache, Priority: u=1, i, and Referer: https://www.wsj.com/. The user-agent fields specify "Chromium";v="140", "Not=A?Brand";v="24", "Google Chrome";v="140", Sec-Ch-Ua-Mobile: ?0, and Sec-Ch-Ua-Platform: "macOS". The record further lists Sec-Fetch-Dest: empty, Sec-Fetch-Mode: no-cors, and Sec-Fetch-Site: cross-site. The displayed data captures the precise signaling and header parameters exchanged between the browser and the remote server during the request, reflecting the addressing, routing, and communication metadata recorded in this network transaction.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 12:**



151.   Figure 13 below shows cookie storage entries displayed within the browser's Application panel for the domain www.wsj.com. The visible table lists multiple paired fields including Name, Value, Domain, Path, and related metadata columns. Entries include pat = -14400000, pvi = eyJpZCI6InYtBWcwanBhc2c3Y…, fbp = fb.1.1758873225766.1906585…, ga = GA1.1.1285854476.1758873227, ga_K2H7B9JRSS = GS2.1.s1758873226$o1$g0$t1…, and gcl_au = 1.1.999143311.1758873228. Other identifiers visible include _lr_geo_location = IN, _lr_geo_location_state = CH, and ncg_domain_id_ = 280132ec-b45e-4dc6-9305-87…. Each record corresponds to structured name–value pairs showing persistent identifiers and associated domain paths within the browser storage for the website session. The displayed data constitutes direct evidence of the network metadata defining the protocol, endpoint, and communication context for this transaction.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 13:**



152.    Figures 9 through 13 collectively illustrate the process through which the Website transmits user-originating metadata to Google's advertising infrastructure, forming the basis for data monetization through profiling and targeted advertising. Figure 9 shows that the user's browser automatically initiated outbound HTTPS requests to www.googletagmanager.com during the Website session, loading Google-managed scripts that in turn generated additional requests to related Google domains. Figure 10 presents a detailed record of those requests, confirming successful 200 responses from www.googletagmanager.com and www.google.com, reflecting the Website's active transfer of signaling data to external Google endpoints. Figure 11 expands on this activity by documenting a POST request to stats.g.doubleclick.net, an endpoint historically associated with Google's advertising and event-measurement framework, which is used to associate browsing activity with user identifiers for subsequent ad delivery and valuation. Figure 12 displays the request headers for a GET call to pagead2.googlesyndication.com, including the explicit Referer: https://www.wsj.com/ value and the User-Agent field containing device, platform, and browser metadata—

46

information used to categorize visitors and match them with advertising segments. Figure 13 shows persistent identifiers stored under the Website's domain, such as GA1.1.1285854476.1758873227 and GS2.1.s1758873226$o1$g0$t1…, evidencing the creation of durable identifiers that can be reused across future sessions. Together, Figures 9 through 13 demonstrate how the Website embeds Google's analytics and advertising infrastructure in a manner that enables the continuous transfer of addressing, routing, and signaling information to external domains for purposes of behavioral profiling and data monetization.

153.    Defendant surreptitiously installed, executed, and injected the Google Trackers onto users' browsers by embedding Google's JavaScript resources through Google Tag Manager. When a user visits the Website, the browser automatically executes these scripts, triggering outbound HTTPS requests, thereby transmitting metadata.    These transmissions occur automatically and without any user action, allowing Google to receive metadata from each browsing session silently and without consent.

154.    The Google Trackers are at least a "process" because they are software routines that identify consumers, gather metadata, and correlate that data with unique identifiers stored on the user's device or within Google's advertising ecosystem.

155.    The Google Trackers are at least a "device" because software operates only through a computing device, and the execution of these scripts depends upon and utilizes the user's browser and local hardware resources to generate and transmit electronic communications. See, e.g., James v. Walt Disney Co. 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

156.    Defendant never obtained a court order permitting the installation or operation of any pen register, trap-and-trace device, or equivalent process, nor did Defendant obtain Plaintiff's or the Class Members' express or implied consent to install or execute the Google Trackers on their browsers or to transmit electronic communications to Google.

## 2.    *The AppNexus Tracker*

157.    The AppNexus Tracker is an advertising synchronization script implemented through Xandr's AppNexus technology, typically delivered via domains such as ib.adnxs.com and acdn.adnxs.com. On the Website, the AppNexus Tracker loads during the initial homepage session and initiates network requests to AppNexus's servers without requiring any user action. Once executed, the script establishes live connections that enable identifier synchronization and the exchange of metadata between the Website and AppNexus infrastructure.

158.    Once the user loads a page, the AppNexus Tracker executes automatically, generating requests such as /ut/v3/prebid, /getuid, and /csync.ashx, which are visible in the Figures below.  These requests include the user's referrer (https://www.wsj.com/) and are sent to AppNexus's servers in real time. This process associates browser-based identifiers with AppNexus's stored records and transmits session-specific metadata without requiring the user to interact with any visible page element.

159.    The data collected by the AppNexus Tracker supports cross-site identity resolution by linking identifiers through cookie values such as XANDR_PANID, as seen in the evidence. These identifiers allow AppNexus to map the browser to persistent pseudonymous profiles that persist across sessions and sites. The presence of matching identifiers across multiple AppNexus domains demonstrates that the system operates to maintain continuity between browsing events and advertising interactions.

160.    The AppNexus Tracker also serves the Website's goal of targeted advertising by participating in bid requests and data exchanges that segment users based on observed visit activity. Through the repeated network calls to ib.adnxs.com, the Website enables AppNexus to share metadata necessary for demand-side bidding and user matching, thereby allowing advertisers to target individuals with greater precision. The AppNexus Tracker contributes to the Website's data monetization strategy by providing AppNexus and its advertising partners with granular metadata about user sessions. This enables advertising demand partners to optimize placement, measure

effectiveness, and refine audience modeling. In doing so, the AppNexus Tracker acts as a structural component of the Website's commercial data exchange ecosystem, transforming ordinary browsing interactions into actionable monetizable data..

161.  Figure 14 below shows a series of DNS query and response transactions exchanged between source address 198.19.190.52 and destination 198.19.0.2 using the DNS protocol. The visible entries include "Standard query 0xbfff A ib.adnxs.com" and corresponding response "Standard query response 0xbfff A ib.adnxs.com CNAME xandr-g-geo.trafficmanager.net CNAME ib.anycas," followed by additional requests and responses for "acdn.adnxs.com," including the resolution "CNAME prod.appnexus.map.fastly.net A 146.75.33.108." These lines document that the browser requested address records for the "adnxs.com" domains and received chain responses resolving to named servers within the AppNexus and Fastly infrastructure. The displayed data provides verifiable network records evidencing the transmission path, domain name resolution sequence, and endpoint identification associated with the observed exchange.

**<u>Figure 14:</u>**



/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

162.   Figure 15 below shows HTTPS request and response records directed to the host "ib.adnxs.com" and "b.adnxs.com," as captured in real time through a Fiddler session log. The entries display URL paths such as "/async_usersync," "/bounce," and "/getuid," each transmitted over HTTPS with response codes 307, 302, and 200. The "Host" column identifies both "ib.adnxs.com" and "b.adnxs.com" as the destination endpoints, and the URL field contains full request strings beginning with "https://ib.adnxs.com/getuid…" and "https://b.adnxs.com/bounce…" [full URL omitted]. The live capture confirms that these exchanges occurred during an active browser session, documenting actual outbound HTTPS communications between the user's browser and AppNexus infrastructure. The displayed data provides verifiable network records evidencing the addressing, routing, and signaling metadata associated with the live connection established between the client and the external AppNexus servers.

**Figure 15:**



163.   Figure 16 below shows network activity recorded in Chrome DevTools, displaying multiple HTTPS requests sent from the browser to the external host

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

"ib.adnxs.com." Visible entries include request names such as "prebid" and "getuid," corresponding to URL paths beginning with "https://ib.adnxs.com/ut/v3/prebid…" and "https://ib.adnxs.com/getuid…" [full URL omitted]. Each request is transmitted using POST or GET and returns a 200 status code, with "ib.adnxs.com" identified as the destination and "https://www.wsj.com/" shown as the referer. The displayed data provides verifiable network records evidencing HTTPS exchanges between the browser and the AppNexus host, capturing the addressing and signaling metadata that define the external connection initiated during the user's session.

**<u>Figure 16:</u>**



164.   Figure 17 below shows a browser storage record visible under the Cookies section of Chrome DevTools, identifying a cookie labeled "XANDR_PANID" associated with the domain ".adnxs.com." The entry lists its path as "/" and its size as "119," with additional fields for attributes such as "HttpOnly," "Secure," and "SameSite." The displayed data constitutes direct evidence of stored session metadata associated with AppNexus infrastructure, showing the identifier and endpoint

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

parameters through which the browser maintained a stateful connection with the external host.

**Figure 17:**



165.   Figures 14 through 17 collectively document the full sequence of network interactions between the user's browser and AppNexus. Figure 14 shows that the browser initiated DNS lookups resolving "ib.adnxs.com" and "acdn.adnxs.com" through CNAME chains pointing to "xandr-g-geo.trafficmanager.net" and "prod.appnexus.map.fastly.net," establishing the external routing necessary for subsequent HTTPS connections. Figure 15 displays live network capture data from Fiddler showing HTTPS requests to "ib.adnxs.com," including paths such as "/getuid" and "/async_usersync," which confirm that the user's browser communicated directly with AppNexus servers during the session. Figure 16 presents Chrome DevTools evidence of multiple HTTPS POST and GET exchanges with "ib.adnxs.com," where repeated "prebid" requests were issued automatically during the page session, all referencing "https://www.wsj.com/" as the referer. Figure 17 shows the persistent cookie labeled "XANDR_PANID" set under the ".adnxs.com" domain, demonstrating the

retention of a unique browser identifier linked to AppNexus infrastructure. Taken together, these figures confirm the establishment of an active data exchange channel between the Website and AppNexus, enabling the transmission and persistence of identifiers that support data monetization through user profiling and advertising network synchronization.

166.  Defendant surreptitiously installed, executed, and injected the AppNexus Tracker onto users' browsers by embedding AppNexus's advertising scripts through the Website's source code. When a user visits the Website, the browser automatically executes these scripts and transmits outbound requests to AppNexus domains, including ib.adnxs.com and acdn.adnxs.com, without any user interaction. These transmissions include metadata such as the user's referrer URL (https://www.wsj.com/), browser identifiers, and other parameters visible in Figures 14 through 17. The evidence shows that the connection with AppNexus's servers is established immediately upon page load, without any act of consent or acknowledgment from the user.

167.  The AppNexus Tracker is at least a "process" because it is software that identifies consumers, gathers session data, and correlates that data with existing identifiers maintained by AppNexus within its advertising network.

168.  The AppNexus Tracker is at least a "device" because the software executes on users' browsers and computing devices, enabling the capture and transmission of metadata through those devices as part of an automated data exchange. See, e.g., James v. Walt Disney Co. 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

169.  Defendant never obtained a court order authorizing the installation or operation of a pen register, trap-and-trace process, or equivalent device, nor did it obtain Plaintiff's or Class Members' express or implied consent to cause their browsers to establish network connections with AppNexus's infrastructure.

**3.    _The Twitter Tracker_**

170.  The Twitter Tracker, typically delivered via the domains static.ads-twitter.com and analytics.twitter.com, is a third-party behavioral tracking script operated

by Twitter, Inc. On the Website, this tracker is embedded into the page's source code and loads automatically when a user visits the homepage. The evidence shows that the browser establishes DNS and HTTPS connections to Twitter's servers, including static.ads-twitter.com and analytics.twitter.com, initiating network requests without any user interaction. These requests confirm that data transmission occurs in the background, allowing Twitter to observe page activity and associate session data with persistent identifiers.

171. Once active, the Twitter Tracker participates in identity resolution by assigning users identifiers such as "guest_id," "guest_id_ads," and "guest_id_marketing," which are stored under the .twitter.com domain. These identifiers allow Twitter to recognize returning users across different browsing sessions and devices. The captured network records show that these cookies are transmitted in conjunction with HTTPS requests to analytics.twitter.com, confirming the existence of an ongoing connection through which Twitter receives browser metadata tied to individual user sessions.

172. The Twitter Tracker supports targeted advertising by linking behavioral data from the Website with Twitter's ad-serving infrastructure. By embedding and executing the uwt.js script from static.ads-twitter.com, the Website enables Twitter to record site activity for ad attribution and retargeting purposes across its platform and partner network. These requests, logged in the DevTools and Fiddler captures, show the transfer of structured parameters and referer values identifying the originating website.

173. The Twitter Tracker contributes to the Website's data monetization and audience targeting framework by converting page interaction data into measurable advertising insights. Through persistent cookies, HTTPS signal exchanges, and recurring analytics calls, Twitter delivers user-level data back to its servers for use in campaign optimization and impression measurement. In this way, the Twitter Tracker functions as a data collection mechanism that establishes, transmits, and preserves identifiers enabling behavioral analytics and advertising operations tied to the Website.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

174. Figure 18 below shows DNS query records captured from a live network session indicating resolution requests for the domains static.ads-twitter.com and analytics.twitter.com. The visible entries display two pairs of standard DNS queries and responses exchanged between the source 198.19.190.52 and destination 198.19.0.2 using the DNS protocol. The first query and response concern static.ads-twitter.com, which is resolved through a CNAME record pointing to platform.twitter.map.fastly.net. The second query and response concern analytics.twitter.com, resolved through a CNAME record pointing to s.twitter.com with an IPv4 address of 162.159.140.229. The displayed data constitutes direct evidence of the addressing and routing metadata through which the client located and connected to the external Twitter domains, documenting the transmission path and resolution sequence between the browser and the identified hostnames.

**Figure 18:**



175. Figure 19 below shows two HTTPS requests made by the browser to the domain static.ads-twitter.com for the resource path "/uwt.js…" [full URL omitted]. Each request is labeled "uwt.js" under the Name field, with the Method recorded as "GET,"

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Status as "200," Domain as "static.ads-twitter.com," and Referer as "https://www.wsj.com/…" [full URL omitted]. The timing entries indicate durations of 118 milliseconds and 133 milliseconds, reflecting successful responses from the external host. The displayed data constitutes direct evidence of addressing and signaling metadata showing that the browser initiated and completed live HTTPS connections with the static.ads-twitter.com endpoint during the observed session, evidencing the transmission path and endpoint configuration between the client and the external domain.

**<u>Figure 19:</u>**



176. Figure 20 below shows a real-time HTTPS GET request captured in Fiddler to https://analytics.twitter.com/i/…[full URL omitted], displaying headers such as "Host: analytics.twitter.com," "Referer: https://www.wsj.com/," and "User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) Chrome/140.0.0.0." The response "HTTP/1.1 200 OK" includes "Set-Cookie" fields like "guest_id=v1%3A175887238082131285" and "personalization_id='v1_Wsbk9MNXOgfTGRNWj/mMkg=='." The displayed data

1  provides verifiable, real-time network evidence documenting the addressing, routing,

2  and signaling exchange between the browser and analytics.twitter.com.

**Figure 20:**



16  177.  Figure 18 shows DNS queries and responses confirming that the browser

17  resolved the hostnames static.ads-twitter.com and analytics.twitter.com during the user's

18  visit to the Website. Figure 19 shows the DevTools record of two successful GET

19  requests to https://static.ads-twitter.com/uwt.js…[full URL omitted], establishing that

20  the uwt.js script was fetched directly from Twitter's ad delivery domain while the

21  Website was loaded. Figure 20, captured in Fiddler, shows a real-time HTTPS GET

22  request to https://analytics.twitter.com/i/…[full URL omitted], including response

23  headers and multiple Set-Cookie fields establishing an active exchange with Twitter's

24  analytics endpoint. Together, Figures 18 through 20 show that the Website caused the

25  user's browser to resolve, request, and communicate with distinct Twitter-controlled

26  servers, confirming contemporaneous addressing, routing, and signaling activity across

27  multiple independent network layers.  Taken together, these captures show the Website

28  transmitting session metadata to Twitter's ad and analytics systems, allowing that data

57

to be associated with known or inferred user identities, matched to location and device context, and transformed into behavioral insights that can be monetized through Twitter's advertising network.

178.    Defendant surreptitiously installed, executed, or embedded the Twitter Tracker onto users' browsers by deploying JavaScript code that establishes communication with Twitter's analytics and advertising infrastructure. When a user visits the Website, the browser automatically executes this code and initiates outbound requests to domains such as static.ads-twitter.com and analytics.twitter.com, transmitting user metadata including IP address, page URL, device information, and identifiers. These transmissions occur without any user interaction or awareness, allowing Twitter to receive data about the user's activity on the Website contemporaneously with the browsing session.

179.    The Twitter Tracker is at least a "process" because it is software that identifies users, gathers data, and correlates that data.

180.    The Twitter Tracker is at least a "device" because in order for software to execute, it must be run on some kind of computing device. See, e.g., James v. Walt Disney Co. 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

181.    The Twitter Tracker initiates a connection to its advertising and analytics infrastructure upon page load via execution of the uwt.js script. It captures user metadata including IP address, page path, timestamp, and unique cookie identifiers, all of which constitute addressing, routing, and signaling information under CIPA.

182.    The user does not intentionally initiate any communication with Twitter; rather, the connection is automatically triggered in the background by embedded third-party code. As a result, Twitter is able to silently intercept and log communication-related data generated during the user's interaction with the Website. In this way, the Twitter Tracker functions as a surveillance mechanism that captures third-party signaling information.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

183.   Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Twitter Tracker on their browsers or to transmit metadata to Twitter.

184.   The Twitter Tracker violates CIPA by enabling the unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

### 4.    *The PubMatic Tracker*

185.   The PubMatic Tracker, delivered via domains such as track.pubmatic.com and image6.pubmatic.com, is a third-party advertising pixel operated by PubMatic, Inc. On the Website, this tracker is embedded within third-party ad delivery code that executes automatically when a user loads the homepage. During the homepage session, the browser initiates outbound requests to PubMatic's servers, including pixel and sync endpoints, each returning standard HTTP responses indicative of PubMatic's identifier-matching infrastructure. These transmissions include data such as IP address, device type, browser version, geolocation, and unique cookie or device identifiers, and occur silently without user interaction, evidencing that user activity is monitored in real time for behavioral profiling, identity resolution, and advertising optimization.

186.   The PubMatic Tracker engages in identity resolution by synchronizing its unique identifiers with those of other advertising exchanges and demand-side platforms. Through these ID-sync requests, PubMatic exchanges hashed identifiers with external ad partners, correlating metadata collected on the Website with broader user profiles spanning multiple websites and devices. This syncing process enables PubMatic to construct unified identity graphs that persist across browsing sessions and platforms.

187.   The PubMatic Tracker further facilitates targeted advertising by connecting its identifiers to downstream advertising networks that retarget individuals with personalized ads across the web. PubMatic's audience-matching tools classify behavioral attributes among Website visitors and generate lookalike segments consisting

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

of users exhibiting similar characteristics or engagement patterns, thereby expanding the reach of the Website's marketing efforts.

188. The PubMatic Tracker advances Defendant's data monetization strategy by transforming real-time behavioral and device-linking data into actionable insights used in programmatic advertising. By monitoring users across multiple digital touchpoints and aligning them with advertiser segments, Defendant gains access to detailed performance analytics and cross-device audience metrics. The resulting data feeds into PubMatic's real-time bidding marketplace, where advertisers compete to target high-value users based on behavioral signals captured on the Website. Through PubMatic's infrastructure, Defendant derives commercial benefit from user activity via profiling, ad exchange participation, and the resale of audience intelligence.

189. Figure 21 below shows a DNS query sequence evidencing communication between the client and the PubMatic domain. The first entry records a Standard query 0x9d19 A request from source 198.19.190.52 to destination 198.19.0.2 seeking resolution of image8.pubmatic.com. The following line displays the corresponding Standard query response 0x9d19 A from 198.19.0.2 to 198.19.190.52 identifying image8.pubmatic.com as a canonical name (CNAME) for image8-v2.pubmnet.com, which in turn resolves to imgsync-nje. The displayed data provides verifiable network records evidencing the addressing, routing, and endpoint identification of this exchange, documenting the metadata handshake by which the client resolved and established communication parameters with the remote PubMatic infrastructure.

/ / /

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 21:**



190. Figure 22 below shows network activity generated by the browser referencing multiple endpoints associated with the domain pubmatic.com. The visible entries list requests including Pug?vcode, ImgSync, and user_sync executed through HTTPS with status codes 200 and 302, referencing URLs such as https://image2.pubmatic.com/…[full URL omitted] and https://image8.pubmatic.com/…[full URL omitted]. Each entry displays paired metadata fields including the Method "GET," the Domain "image2.pubmatic.com" and "image8.pubmatic.com," and the Referrer "https://www.wsj.com/…[full URL omitted]," with response times ranging from 38 ms to 81 ms. The displayed data constitutes direct evidence of the addressing and signaling exchanges through which the browser established and maintained communication with the identified PubMatic domains.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 22:**



191.    Figures 21 and 22 together demonstrate that when a user visits the Website, their browser initiates outbound network activity directed to PubMatic's advertising infrastructure. Figure 21, captured in Wireshark, shows DNS resolution events for the hostname image8.pubmatic.com, which is mapped through canonical name (CNAME) records to image8-v2.pubmnet.com and imgsync-nje, confirming that the browser performed domain lookups and routing necessary to connect with PubMatic's servers. Figure 22, captured in Chrome DevTools, displays multiple HTTPS requests from the Website to PubMatic endpoints such as image2.pubmatic.com and image8.pubmatic.com, including Pug?vcode and ImgSync requests that returned 200 and 302 responses within milliseconds. Together, these figures provide complementary layers of addressing and signaling evidence — the Wireshark capture reflecting real-time DNS resolution and routing to PubMatic's domains, and the DevTools capture showing successful HTTP transactions — collectively documenting that the Website's code established live network connections to PubMatic's advertising ecosystem.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

192. Defendant surreptitiously installed, executed, or embedded the PubMatic Tracker onto users' browsers by deploying JavaScript code that initiates communication with PubMatic's advertising infrastructure. When a user visits the Website, their browser automatically executes this code and establishes outbound connections to PubMatic's servers, transmitting user metadata including IP address, page URL, device type, and unique cookie identifiers. These transmissions occur silently and without any user action, enabling PubMatic to receive data regarding user interactions with the Website as they occur.

193. The PubMatic Tracker is at least a "process" because it is software that identifies users, collects data, and correlates that data across multiple contexts.

194. The PubMatic Tracker is at least a "device" because software must operate through a computing device in order to perform its functions. See, e.g., James v. Walt Disney Co. 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

195. The PubMatic Tracker initiates a connection to its ad-serving infrastructure upon page load via an embedded script or pixel execution. It captures network-level metadata such as IP address, page path, timestamp, and unique identifiers, all of which constitute addressing, routing, or signaling information under CIPA.

196. The user does not intentionally initiate any communication with PubMatic; rather, the connection is automatically triggered in the background by the embedded third-party code. As a result, PubMatic is able to intercept and record signaling data generated during the user's interaction with the Website. In this way, the PubMatic Tracker functions as a surveillance mechanism that captures third-party signaling information without the user's knowledge.

197. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the PubMatic Tracker on their browsers or to collect or share data with PubMatic.

/ / /

198.   The PubMatic Tracker violates CIPA by enabling the unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

## VI.   CLASS ALLEGATIONS

199.   Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

200.   The Class does not include (1) Defendant, its officers, and/or directors; (2) the Judge and/or Magistrate to whom this case is assigned; (3) the Judge or Magistrate's staff and family; and (4) Plaintiff's counsel and Defendant's counsel.

201.   Plaintiff reserves the right to amend the above class definition and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

202.   **NUMEROSITY:**  Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

203.   **COMMONALITY:**  Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded, or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether Plaintiff and Class Members are subject to same tracking policies and practices;

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

- Whether Defendant violated CIPA;

- Whether Plaintiff and Class Members are entitled to statutory damages;

- Whether Class Members are entitled to injunctive relief; and

- Whether Class Members are entitled to disgorgement of data unlawfully obtained.

204. **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

205. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

206. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VII.   FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 638.51

### *By Plaintiff and the Class Members Against All Defendants*

207. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

208. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

209. Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are

designed to capture the IP address, User Information, and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

210.    Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## VIII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for the following:

1.  An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2.  An order declaring that Defendant's conduct violates CIPA;

3.  An order of judgment in favor of Plaintiff and the Class against Defendant on the cause of action asserted herein;

4.  An order enjoining Defendant's conduct as alleged herein;

5.  Statutory damages pursuant to CIPA;

6.  Prejudgment interest;

7.  Reasonable attorney's fees and costs; and

8.  All other relief that would be just and proper as a matter of law or equity.

///

///

///

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Dated:   October 29, 2025        Respectfully submitted,


By: */s/Reuben D. Nathan*
**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan, Esq. (SBN 208436)
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com


*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED